NO. 15-1708

_____

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

**WESTMORELAND COAL COMPANY,**

**Petitioner,**

**v.**

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; and PATRICIA F. FITZWATER (WIDOW OF JACKIE L. FITZWATER),**

**Respondents.**

## ON PETITION FOR REVIEW FROM THE UNITED STATES DEPARTMENT OF LABOR, BENEFITS REVIEW BOARD

_____

# OPENING BRIEF OF PETITIONER WESTMORELAND COAL COMPANY

_____

**Paul E. Frampton, Esq.**
**Thomas M. Hancock, Esq.**
**Bowles Rice LLP**
**600 Quarrier Street**
**Charleston, WV 25301**
**304-347-1163**
*Counsel for Petitioner,*
*Westmoreland Coal*
*Company*

## TABLE OF CONTENTS

I. JURISDICTIONAL STATEMENT ...................................................2

II. STATEMENT OF THE ISSUES ...................................................2

III. STATEMENT OF FACTS.........................................................3

IV. SUMMARY OF ARGUMENT ....................................................4

V. ARGUMENT.........................................................................6

    A. STANDARD OF REVIEW..................................................6

    B. DISCUSSION OF ISSUES .................................................7

        1.    As an initial matter, ALJ Harris should have determined that Westmoreland is not the responsible operator for Mr. Fitzwater's claim. ...................7

        2.    The ALJ erred by not considering that Mr. Fitzwater's intrinsic cardiac problems, which were unrelated to lung disease, caused his right-sided congestive heart failure.................................14

        3.    The ALJ erred by failing to consider whether the opinions of the physicians who opined on total disability were supported by acceptable medical evidence in the record. ............................18

        4.    The ALJ erred by not apportioning weight to the autopsy evidence, which is the "Gold Standard" for determining the extent of lung disease and which revealed a minimal level of coal mine dust exposure.........................21

        5.    The ALJ erred by not apportioning weight to radiographic evidence that supported a finding of minimal coal mine dust exposure.....................28

        6.    The ALJ erred by not apportioning weight to the medical opinions which were best supported by the pathology and x-ray evidence and which

**indicated that Mr. Fitzwater's death was due to a stroke, infected heart valve, and kidney failure.**................................................................29

**VI. REQUEST FOR ORAL ARGUMENT** ......................................................42

**VII. CONCLUSION** ...........................................................42

## TABLE OF AUTHORITIES

*Arnold v. Secretary of Health, Safety and Welfare*, 567 F.2d 258 (4th Cir. 1977) ............................................................................................. 21

*Casella v. Kaiser Steel Corp.*, 9 BLR 1-131, 1-134 (1986) .................................. 21

*Consolidated Edison Co. of New York v. National Labor Relations Bd.,* 305 U.S. 197 (1938) ..................................................................................... 6

*Crabtree v. Bethlehem Steel Corp.*, 7 Black Lung Rep. 1-354 (Ben.Rev.Bd.1984) ...................................................................................... 9

*Dehue Coal Co. v. Ballard,* 65 F.3d 1189 (4th Cir. 1995) ..................................................................... 6, 7

*Director, Office of Workers' Comp. Programs v. Trace Fork Coal Co.,* 67 F.3d 503 (4th Cir.1995) ............................................................. 9, 10, 15

*Island Creek Coal Co. v. Compton*, 211 F.3d 203 (4th Cir. 2000) .................. 32, 43

*Mancia v. Director,* 130 F.3d 579, 585 (3d Cir. 1997) ......................................... 17

*Milburn Colliery Co. v. Hicks,* 138 F.3d 524 (4th Cir. 1998) ...................................................................... 7

*Penn Allegheny Coal Co. v. Williams*, 114 F.3d 22, 24-25 (3d Cir. 1997) ...................................................................................................... 32, 43

Section 1556(a) of the Patient Protection and Affordable Care Act ....................... 1

*See Director, OWCP v. Rowe*, 710 F.2d 251 (6th Cir. 1983) ............................... 20

*Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438 (4th Cir. 1997) ...................................................................... 7

*Tapley v. Bethenergy Mines, Inc*., BRB No. 04-0790 BLA (May 26, 2005) (unpub.) ......................................................................................... 29

*Venicassa v. Director, Office of Workers' Comp. Programs*, 137 F.3d 197 (3d Cir.1998) .................................................................................. 9, 11

*Virgil v. Director*, OWCP, 8 BLR 1-99, 1-100-01 (1985) ..................................... 21

**Statutory Authorities**

30 U.S.C. § 901 ....................................................................................... 2

30 U.S.C. § 932(1) ................................................................................ 15

30 U.S.C. § 932(a) .................................................................................. 2

33 U.S.C. § 921(c) ..............................................................................1, 2

5 U.S.C. § 557(c)(3)(A) ......................................................................... 5

**Regulations**

20 C.F.R. § 718.202(a)(2) .................................................................... 10

20 C.F.R. § 718.202(a)(4) ...................................................................... 6

20 C.F.R. § 718.204 .............................................................................. 12

20 C.F.R. § 718.204(b) ......................................................................... 13

20 C.F.R. § 725.482(a) ........................................................................... 2

20 C.F.R. § 725.494(e)(1) .................................................................... 14

20 C.F.R § 725.414(a)(1) ..................................................................... 29

20 C.F.R. § 725.495(d) ......................................................................... 14

20 C.F.R. §§ 725.410(b) ......................................................................... 9

5 U.S.C. § 557(c)(3)(A) ....................................................................... 21

20 C.F.R. § 725.412…………………………………………………….. 9

This appeal arises from the Administrative Law Judge's ("ALJ") decision awarding benefits to the surviving spouse of Claimant Jackie Fitzwater ("Mr. Fitzwater") who died in 2008 as a result of significant medical problems, including a congenital abnormality of his aortic valve, end-stage congestive heart failure, and end-stage renal failure.  The record below unequivocally reflects (1) that Mr. Fitzwater did not have complicated pneumoconiosis prior to his death; (2) that Mr. Fitzwater was not totally disabled from simple pneumoconiosis prior to his death; (3) that pneumoconiosis did not cause or substantially contribute to his death; and (4) that Westmoreland Coal Company is not the proper responsible operator.

This survivor's claim is governed by the regulations as amended in 2001 found at 20 C.F.R. Part 718 and Part 725.  The claim is further governed by 20 C.F.R. § 718.205 which provides that federal black lung benefits are to be paid to eligible survivors of a deceased miner *only if* the death was due to pneumoconiosis, and by Section 1556(a) of the Patient Protection and Affordable Care Act ("PPACA").  Under these regulations, the Department of Labor Benefits Review Board (the "Board") should have reversed the ALJ's decision to award benefits.

# I.  JURISDICTIONAL STATEMENT

This matter involves an appeal from a final order of the Board regarding Mr. Fitzwater's claim.  The Board affirmed the award of benefits to Mr. Fitzwater issued by ALJ Lystra A. Harris on April 3, 2014.  Appendix (hereinafter "App."), p. 142  This Court has jurisdiction over an appeal from a final order of the Board pursuant to Section 21(c) of the Longshore and Harbor Workers' Compensation Act ("LHWLA"), 33 U.S.C. § 921(c), as incorporated by Section 422(a) of the Black Lung Benefits Act, 30 U.S.C. § 932(a).

The jurisdictional time limits for filing an appeal from a final order of the Board is sixty (60) days.  *See* 33 U.S.C. § 921(c), 20 C.F.R. § 725.482(a).  The Board issued its final order denying the relief requested by Westmoreland on April 29, 2015.  App., p. 179.  On June 26, 2015, Westmoreland filed a Petition for Review in the United States Court of Appeals for the Fourth Circuit.  Docket Entry (hereinafter "Doc.") 3.  It is undisputed that the injury alleged in this case occurred in the geographical territory of the Fourth Circuit.  Therefore, this Court has jurisdiction to review the decisions of the Board and the ALJ.

# II.  STATEMENT OF THE ISSUES

1.  Did the ALJ err by determining that Westmoreland is the responsible operator for purposes of this survivor's claim?

2.  Did the ALJ err by not considering that Mr. Fitzwater's intrinsic cardiac problems, which were unrelated to lung disease, caused his right-sided congestive heart failure?

3.   Did the ALJ err by failing to consider whether the opinions of the physicians who opined on total disability were supported by acceptable medical evidence in the record?

4.   Did the ALJ err by not apportioning weight to the autopsy evidence, which is the "Gold Standard" for determining the extent of lung disease and which revealed a minimal level of coal mine dust exposure?

5.   Did the ALJ err by not apportioning weight to radiographic evidence that supported a finding of minimal coal mine dust exposure?

6.   Did the ALJ err by not apportioning weight to the medical opinions which were best supported by the pathology and x-ray evidence and which indicated that Mr. Fitzwater's death was due to a stroke, infected heart valve, and kidney failure?

## III. STATEMENT OF FACTS

Ms. Patricia Fitzwater, surviving spouse of Mr. Fitzwater, filed a claim seeking benefits under the applicable provisions of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 901, commonly known as the Black Lung Benefits Act ("BLBA'), on January 18, 2009.   App. 180.   On December 14, 2009, the Department of Labor issued a Proposed Decision and Order - Award of Benefits.   App. 18.   Pursuant to Westmoreland's request for a hearing, this matter was forwarded to the Office of Administrative Law Judges.

A hearing was eventually held on April 17, 2011, in Beckley, West Virginia.   At the hearing, the evidence admitted into the administrative record included Director's Exhibits 1-40, Claimant's Exhibits 1-8, and Employer's Exhibits 1-7.

On April 3, 2014, ALJ Harris issued a Decision and Order Awarding Benefits. After determining that Mr. Fitzwater was totally disabled by a respiratory or pulmonary impairment, ALJ Harris then applied the PPACA presumption that Mr. Fitzwater died due to pneumoconiosis. ALJ Harris ultimately determined that Westmoreland did not rebut the presumption of death due to pneumoconiosis and, therefore, awarded benefits.

## IV. SUMMARY OF ARGUMENT

As an initial matter, ALJ Harris's determination that Westmoreland is the responsible operator with respect to Ms. Fitzwater's survivor's claim is not in accordance with the law, not rational, and not supported by substantial evidence. Specifically, the ALJ did not consider the fact that the District Director failed to develop critical evidence related to the determination of responsible operator. Accordingly, this Court's precedent and the precedent of other circuits indicates that this survivor's claim should be turned over for payment by the Black Lung Disability Trust Fund (the "Trust Fund").

With respect to the substance of Mr. Fitzwater's claim, ALJ Harris's decision to award benefits was not in accordance with the law, not rational, and not supported by substantial evidence. First, the ALJ erred in determining that Mr. Fitzwater was totally disabled. Specifically, the ALJ did not consider the fact that Mr. Fitzwater's intrinsic cardiac problems, which were unrelated to lung disease,

caused his right-sided congestive heart failure. Therefore, the ALJ should have determined that Mr. Fitzwater's right-sided congestive heart failure did not meet the definition of *cor pulmonale*. The ALJ further erred in her determination of total disability because she did not evaluate whether the medical opinions regarding total disability were supported by the objective medical records and documentation.

After determining that Mr. Fitzwater was totally disabled, the ALJ further erred in applying the PPACA presumption to a case where total disability was ***not*** established by a preponderance of the evidence. In applying the PPACA presumption, the ALJ improperly conflated "causation" of Mr. Fitzwater's death with the "existence" of pneumoconiosis to conclude that Petitioner Westmoreland Coal Company ("Westmoreland") did not rebut the PPACA presumption.

In short, Mr. Fitzwater suffered and died from complications caused by a congenital abnormality of his aortic valve, by his end-stage congestive heart failure, by end-stage renal failure, and by other serious medical conditions. None of these conditions was caused by, substantially contributed to, or aggravated by, his coal mine dust exposure. Only by expanding the medical definition of *cor pulmonale* to include ***any*** heart problem did the ALJ find total disability here. And only by applying the PPACA presumption, but ignoring the causation analysis

5

required thereunder, did the ALJ award benefits.  Accordingly, the Board should

have reversed the ALJ's decision to award benefits.

## V.  ARGUMENT

### A.  STANDARD OF REVIEW

In reviewing claims for benefits under the BLBA, this Court

determines whether substantial evidence supports the findings of fact and

conclusions of law issued by the ALJ.  *Dehue Coal Co. v. Ballard,* 65 F.3d 1189,

1193 (4th Cir. 1995).  Substantial evidence is defined as "such relevant evidence as

a  reasonable  mind  might  accept  as  adequate  to  support  a  conclusion."

*Consolidated Edison Co. of New York v. National Labor Relations Bd.,* 305 U.S.

197, 229 (1938); *Milburn Colliery Co. v. Hicks,* 138 F.3d 524, 529 (4th Cir. 1998).

In  determining  whether  substantial  evidence  supports  the  ALJ's  factual

determination, the Court should address whether the ALJ analyzed all relevant

evidence and whether the ALJ sufficiently explained the rationale used in crediting

certain evidence.  *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439

(4th Cir. 1997). The ALJ's and Board's conclusions of law are to be reviewed *de

novo* to determine if they are rational and consistent with the applicable law. *See

Dehue,* 65 F.3d at 1193.

## B.  DISCUSSION OF ISSUES

**1.    As an initial matter, ALJ Harris should have determined that Westmoreland is not the responsible operator for Mr. Fitzwater's claim.**

Federal regulations create a framework for determining the employer responsible for payment of a miner's black lung benefits.  The "responsible operator" is the employer "with which the miner had the most recent periods of cumulative employment of not less than 1 year."  20 C.F.R. § 725.493(a)(1) (1999).  Significantly here,  Mr. Fitzwater's last employer was not Westmoreland, but The Lady H Coal Co. ("Lady H").  App. 175.  Mr. Fitzwater worked for Westmoreland in various positions from 1956 to 1986, ***and then*** he went to work for Lady H where he worked until his retirement in 1994.  App. 175.

Despite the fact that Mr. Fitzwater last worked for Lady H, ALJ Harris and the Board rubber-stamped the decision of the U.S. Department of Labor ("DOL") with respect to the conclusion that Westmoreland is the responsible operator for this survivor's claim.  That conclusion was stated by the DOL as follows:  "[Westmoreland] is not the last operator that most recently employed [Mr. Fitzwater] but is the last operator that is financially capable of assuming liability for the payment of benefits…."  App. 27-28.

The DOL arrived at this conclusion by reviewing its file and identifying the following two facts:  (1)  that Lady H was insured by the WV CWP

7

Fund, which policy was no longer in force at the time of Mr. Fitzwater's last exposure; and (2) that Lady H declared bankruptcy. *Id*.

If the DOL's only responsibility were to identify the "existence" of evidence, then the DOL would have been correct in determining that Westmoreland is the responsible operator. But the analysis simply does not stop there for the DOL. Under the regulations, the DOL must identify, notify, ***and develop*** evidence regarding potential responsible operators. *See* 20 C.F.R. §§ 725.410(b), 725.412 (1999). Here, the DOL's failure to develop evidence regarding whether or not the insurance policy purchased by Lady H covered Claimant's employment with Lady H resulted in Westmoreland's naming as the responsible operator when the claimant worked for a period longer than one year with Lady H, and Lady H was insured.

When the DOL has failed to develop evidence adequately or has failed to resolve the responsible operator issue at a preliminary stage of the case, courts have refused to remand the case for further proceedings regarding the responsible operator. Instead, the Black Lung Disability Trust Fund ("Trust Fund") then pays the benefits to which the miners were entitled. *See, e.g., Venicassa v. Director, Office of Workers' Comp. Programs*, 137 F.3d 197 (3d Cir.1998); *Director, Office of Workers' Comp. Programs v. Trace Fork Coal Co.*,

67 F.3d 503 (4th Cir.1995); *Crabtree v. Bethlehem Steel Corp.*, 7 Black Lung Rep. 1-354 (Ben.Rev.Bd.1984).

In *Trace Fork*, this Court held that the Board properly dismissed Trace Fork as the responsible operator because the Director "inadequately developed the evidence so that the responsible operator could not be definitively identified." *Trace Fork*, 67 F.3d at 506. Further, this Court upheld the Board's decision not to remand the case for the appointment of another responsible operator:

> [T]he Director must resolve the responsible operator issue in a preliminary proceeding, or else proceed against all potential operators at each stage of the claim adjudication, to prevent piecemeal litigation and avoid due process concerns. If this case were remanded and another responsible operator named, that operator would be entitled to challenge [the claimant's] entitlement to benefits. We are unwilling to potentially upset the finding that [the claimant] is entitled to benefits, a matter already fully litigated on the merits.

*Id.* at 508 (internal citation omitted).

Similarly, in *Venicassa*, the Third Circuit refused to allow further consideration of the responsible operator issue. It upheld the assignment of liability to the Trust Fund, because the Director "did not make a timely designation of the proper responsible operator, nor did it even make a timely attempt to correct its mis-designation or to add [other] potential responsible operator[s]...." *Venicassa*, 137 F.3d at 203.

9

Here, when Mr. Fitzwater's current claim was filed on January 18, 2009, a Certificate of Insurance from the UMWA Health and Retirement Funds was filed which confirmed Mr. Fitzwater's last date of employment with Lady H was July 1, 1994, when he retired. This issue is not disputed. Further, the DOL initially issued a notice of claim to Lady H Coal Co.'s insurer, American Mining Claims Services[1]. App. 256. Lady H's insurer did not respond by denying the existence of a policy. App. 256. To the contrary, Lady H's insurer responded by requesting to be included on all pleadings and admitting that Lady H Coal was the proper responsible operator, except insofar as additional records could exist documenting subsequent employment. App. 256. Lady H's insurer essentially conceded the responsible operator designation absent evidence of a subsequent employer.

A Request for Identification of Responsible Operator was sent to Westmoreland on February 2, 2009, stating that the Lady H policy of insurance was cancelled on March 16, 1994. App. 27-28. Lady H declared bankruptcy and the company's assets were acquired by a subsidiary of A. T. Massey, free and clear of any liability per the U.S. Bankruptcy Court, Southern District, West Virginia.

---

[1] Other documents list the West Virginia Coal Workers' Pneumoconiosis Fund as the insurer for Lady H Coal. Upon information and belief, it appears that American Mining Claims Service was acting as a Third Party Administrator on behalf of the West Virginia Coal Workers' Pneumoconiosis Fund in regard to this claim.

10

App. 27-28.  Notably, Westmoreland timely responded and informed the DOL of the necessary insurance information regarding Lady H.  App. 257.

In a letter dated July 24, 2009, Westmoreland's third party administrator, Wells Fargo, informed the DOL of Lady H's insurer and even provided a policy number.  App. 257.  This is consistent with the DOL's notice of claim sent to Lady H's insurer, and consistent with the insurer's response where it essentially admitted responsible operator status pending any additional employment records.  App. 256.

In addition to the letter from Wells Fargo on its behalf, Westmoreland's counsel also wrote to the DOL claims examiner.  App. 259.  This letter also objected to DOL's position that Westmoreland had the burden to prove what entity was the responsible operator.  App. 260.

The DOL never obtained and circulated a copy of the policy of insurance, never requested any determination of whether or not Lady H's insurance would cover the claim in question, and failed to reveal the details of the bankruptcy and whether or not the DOL had any  involvement in the bankruptcy as a creditor. Such information is crucial because, in bankruptcy proceedings, trust funds can be set up to cover future black lung liability.  For instance, if any such fund was set up, but was insufficiently funded per the agreement of the DOL, any liability ***not*** covered by the fund should fall on the Trust Fund.  On the other hand, if the DOL

failed to participate in bankruptcy proceedings and failed to assert a claim for black lung liability (such that a fund would have been set up from the assets of Lady H), then liability would again fall on the Trust Fund.

Additionally, although the DOL stated that Lady H's insurance was canceled at the time of the bankruptcy, ***no details*** from the insurance policy are in the record showing that it was a "claims made" coverage policy, rather than an "occurrence during the coverage period" policy. This is also crucial information. If Lady H's policy were occurrence-based (like many workers' compensation policies are and were), then coverage may still exist for exposures occurring during the policy period. But simply finding that insurance was canceled at a later date does not prove the Lady H is in capable of assuming liability for the payment of benefits. The record here included Lady H's response to the notice of claim indicating that it was insured by WV CWP Fund policy ***during*** the time when Mr. Fitzwater was employed by Lady H. App. 256. No further request to the WV CWP fund appears to have been made by the DOL to determine the terms of the policy, or ask if coverage existed for this claim.

Finally, the regulations themselves preclude naming a previous employer the responsible operator when an insurance policy was in place. According to 20 C.F.R. § 725.495(d),

> In any case referred to the Office of Administrative Law
> Judges pursuant to § 725.421 in which the operator

12

> finally designated as responsible pursuant to §
> 725.418(d) is not the operator that most recently
> employed the miner, the record shall contain a statement
> from the district director explaining the reasons for such
> designation. If the reasons include the most recent
> employer's failure to meet the conditions of § 725.494(e),
> the record shall also contain a statement that the Office
> has searched the files it maintains pursuant to part 726,
> and that the Office has no record of insurance coverage
> for that employer, or of authorization to self-insure, that
> meets the conditions of § 725.494(e)(1) or (e)(2). Such a
> statement shall be prima facie evidence that the most
> recent employer is not financially capable of assuming its
> liability for a claim. In the absence of such a statement, it
> shall be presumed that the most recent employer is
> financially capable of assuming its liability for a claim.

20 C.F.R. § 725.495(d). Notably, this provision only allows the DOL to name a

prior employer the responsible operator where there is "no record of insurance

coverage for that employer." *Id*. Here, the DOL had record of insurance coverage

and was put on notice of the insurer and policy number by Westmoreland. App.

256-260. Additionally, the insurance company who issued the policy (the West

Virginia Coal Workers' Pneumoconiosis Fund) is certainly not insolvent pursuant

to § 725.494(e)(1). In this situation, the regulation states that "it shall be presumed

that the most recent employer is financially capable of assuming its liability for a

claim." *Id*.    As a matter of law, Westmoreland is not the proper responsible

operator. DOL's failure to develop evidence regarding whether the WV CWP fund

policy covered this claim is not a failure that falls at Westmoreland's feet. The

DOL learned that the policy was canceled following Lady H's bankruptcy, but

13

failed to develop evidence regarding whether or not the policy covered this claim. This violates both the case law interpreting the Act and the regulations.

Thus, the ALJ erred by simply rubber-stamping the DOL's decision regarding Westmoreland's status as the responsible operator, and should have determined under the regulations and this Court's precedent that the DOL failed to develop a factual record sufficient to determine which entity is the responsible operator for this survivor's claim. Specifically, DOL never determined whether the insurance policy covering Lady H when claimant worked there provides coverage for this claim. This failure is egregious when considered in light of the fact that the third-party administrator for Lady H's insurer essentially admitted responsible operator status, and in light of the fact that Westmoreland provided the necessary insurance information to the DOL. Accordingly, per *Trace Fork*, *supra*, this Court should order that this survivor's claim be turned over to the Trust Fund for the payment of benefits, and for Westmoreland's dismissal.

2.    **The ALJ should have found that Mr. Fitzwater's intrinsic cardiac problems, which were unrelated to lung disease, caused his right-sided congestive heart failure.**

Despite significant medical opinion to the contrary from Drs. Rosenberg and Zaldivar, ALJ Harris conflated the definition of a specific, cardio-pulmonary disease—*cor pulmonale*—with ***any and all*** right-sided ventricular dysfunction. As a result, the ALJ determined that an individual suffering from

14

heart disease unrelated to coal mine dust exposure is nevertheless totally disabled from a respiratory perspective.  That decision is not rational, contrary to the law, and not supported by the evidence.

*Cor pulmonale* is ***right-sided*** ventricular dysfunction ***resulting from lung disease***.  In layman's terms, it essentially means that a patient's lung disease progressed to a point where the chamber on the right side of the heart begins to fail.  The right side is mentioned instead of the left side, because left-sided ventricular dysfunction is not associated with lung problems.

Although a complete medical definition of *cor pulmonale* was not included in the regulations (and was not part of the ALJ's decision), the medical definition has been discussed thoroughly by various appeals courts.  In *Mancia v. Director*, the Third Circuit found that *cor pulmonale* is a cardiovascular disease and is defined as:

> Right ventricular (RV) enlargement secondary to malfunction of the lungs, producing pulmonary artery hypertension that may be due to intrinsic pulmonary disease, an abnormal chest bellows, or a depressed ventilatory drive. The term does not include RV enlargement secondary to left ventricular (LV) failure, congenital heart disease, or acquired valvular heart disease. CP is usually chronic but may be acute and reversible.

*Mancia v. Director,* 130 F.3d 579, 585 (3d Cir. 1997) *citing* THE MERCK MANUAL, Cardiovascular Disorders, 16th ed. (1992).  Although the law of the

Third Circuit does not necessarily apply here, this citation to a well-known medical textbook for a definition of *cor pulmonale* is useful to this Court's decision.

The definition of *cor pulmonale* from the Merck Manual is especially important here, because it includes not only a sentence describing what *cor pulmonale is*, but also a sentence describing what it *is not*. *Cor pulmonale* is right-sided ventricular dysfunction resulting from lung disease; it is not right-sided ventricular dysfunction resulting from left ventricular failure, congenital heart disease, or acquired valvular heart disease. *Mancia*, *id*., *citing* the Merck Manual.

This definition is particularly logical when viewed through the lens of the purpose of *cor pulmonale* in the BLBA. The BLBA uses *cor pulmonale* to show disability. If the definition of *cor pulmonale* includes ***any*** right-sided ventricular dysfunction (as the ALJ incorrectly determined) which could be caused or contributed to by coal dust exposure, numerous individuals with no ventilatory defect, no oxygenation defect, but with ***whole heart*** problems (that may happen to include the right side), would be found to be totally disabled. Such an expansive definition of specific disease could not have been intended when *cor pulmonale* was listed as a method to prove total respiratory disability under the BLBA.

Here, the ALJ found that Mr. Fitzwater did not establish disability based either on his pulmonary function tests or his arterial blood gas studies. App. 148. Instead, the ALJ had to utilize an improper definition of *cor pulmonale* to

16

determine that Mr. Fitzwater was totally disabled. But Drs. Rosenberg and Hippensteel both testified that Mr. Fitzwater's right-sided ventricular dysfunction was a result of underlying cardiac issues, and *not* lung disease. Tellingly, the only physicians that did actually diagnose *cor pulmonale* recognized that Mr. Fitzwater's right-sided ventricular dysfunction existed ***before*** he demonstrated any evidence of lung disease.

Indeed, Drs. Rosenberg and Hippensteel related the Mr. Fitzwater's right-sided ventricular dysfunction to left-sided ventricular problems, aortic stenosis, obstructive sleep apnea, and restrictive pericarditis.[2] As will be discussed in a moment, the ALJ here chose to discredit these doctors without a proper basis for doing so, while crediting Dr. Smith and Dr. Houser.

Dr. Smith, in addition to being a testifying expert in this case, was also Mr. Fitzwater's treating physician. This is important because Dr. Smith was the first physician to diagnose Mr. Fitzwater with right-sided ventricular dysfunction. Significantly, Dr. Smith previously diagnosed right-sided ventricular dysfunction as a result of restrictive pericarditis, at a time when Mr. Fitzwater was experiencing little to no symptomology of the lungs. App. 301, 307. Dr. Smith's

---

[2] Restrictive pericarditis is a medical condition characterized by a thickening of the lining around the heart, which limits the heart's ability to function normally. It is unrelated to coal mine dust exposure, and no physician in this case opined that they were aware of medical literature linking this condition to coal dust. It is a frequent complication of heart attacks, and can occur in conjunction with infectious processes like tuberculosis or fungal infections of the chest cavity.

prior diagnosis was a significant contradiction to his later opinion that Mr. Fitzwater's right-sided ventricular dysfunction was related to coal workers' pneumoconiosis.

With respect to this contradiction, the ALJ determined that Dr. Smith's prior diagnosis was "already addressed" by Mr. Fitzwater's prior heart surgery. To explain, Mr. Fitwater previously underwent heart surgery known as "stripping", which removed some of the fibrotic lining around his heart, presumably improving its function. However, neither Dr. Smith nor Dr. Houser (nor the ALJ) explained why or how the pericardial stripping procedure prevented future calcification of the pericardium. Instead, the ALJ simply determined that Mr. Fitzwater's surgery removed the legal issue of the cause of right-sided ventricular dysfunction from her purview, and did actually not analyze whether the right sided-ventricular dysfunction here was *cor pulmonale*. This was an error.

### 3.    The ALJ erred by failing to consider whether the opinions of the physicians who opined on total disability were supported by acceptable medical evidence in the record.

Rather than view the physicians' opinions regarding total disability through the lens of the spirometry and arterial blood gas studies to determine which doctors' opinions were actually based on the objective medical evidence in the record, the ALJ chose discredited Drs. Rosenberg and Hippensteel. The ALJ did so because they had not reviewed treatment records from Dr. Smith, despite

reviewing a summary of Smith's records and Smith's testimony. Indeed, the ALJ chose to credit Drs. Smith and Houser, even though their opinions were *inconsistent* with the objective medical evidence in the form of spirometry and arterial blood gas studies, and even though Dr. Smith relied on treatment arterial blood gas studies that Smith admitted in his deposition occurred during acute episodes of heart disease or lung disease and therefore were not appropriate measures of claimant's lung function.

Medical opinions submitted by any party cannot be accepted at face value but must be analyzed for rationale and support in the medical data as a whole. *See Director, OWCP v. Rowe*, 710 F.2d 251 (6th Cir. 1983). In *Rowe*, the Sixth Circuit commented that where expert reports or testimony are relied upon, an ALJ must assess the rationale, basis, and support for each opinion. 710 F.2d at 255. In *Casella v. Kaiser Steel Corp.*, 9 BLR 1-131, 1-134 (1986), the Board said that "where the record contains competent medical testimony that a miner's qualifying objective test scores may have been affected by a health condition not related to (and therefore not indicative of) the type of disease or impairment which the objective tests were designed to detect, such evidence must be discussed." This is a specific application of the Administrative Procedure Act's ("APA") requirement that all relevant evidence must be considered and weighed. 5 U.S.C. §

19

557(c)(3)(A); *Virgil v. Director*, OWCP, 8 BLR 1-99, 1-100-01 (1985); *Arnold v. Secretary of Health, Safety and Welfare*, 567 F.2d 258 (4th Cir. 1977).

Here, the ALJ observed that one of the arterial blood gas studies on which Dr. Smith relied was taken very near to the time of the Mr. Fitzwater's heart surgery. The ALJ similarly observed that one of the blood gas studies on which Dr. Smith relied was taken when Mr. Fitzwater was afflicted by toxic shock syndrome, a disease unrelated to coal mine dust exposure. App. 150, fn 6-7. Despite recognizing these infirmities, the ALJ did not discuss at all whether they would invalidate the blood gases that Dr. Smith relied upon.

The ALJ also did not discredit either Dr. Smith or Dr. Houser for their lack of reliance on the spirometry and arterial blood gas studies which were actually placed into evidence by the parties. Additionally, the ALJ placed importance on the fact that the claimant was prescribed oxygen, without considering whether or not the oxygen prescription could be related entirely to his heart disease and problem his heart had pumping blood.

Both Dr. Rosenberg and Dr. Hippensteel discussed how the miner's congestive heart failure which followed his heart surgery caused pulmonary hypertension in his lungs unrelated to coal mine dust exposure. The ALJ discredited these opinions because Drs. Rosenberg and Hippensteel relied upon Dr. Smith's own analysis of his treatment records and Dr. Smith's own deposition

testimony where he was extensively questioned by counsel, rather than reviewing over a thousand pages of Dr. Smith's medical records dating back to the early 1980s. The ALJ did not explain why learning the results of an arterial blood gas study from a treatment record through Dr. Smith's report, or learning of a diagnosis through Dr. Smith's deposition, were somehow inferior to learning the same information from the treatment records.

The ALJ erred by discrediting Rosenberg and Hippensteel, while crediting Smith and Houser, simply because Rosenberg and Hippensteel relied on Dr. Smith's own summary of Smith's medical records. The opinions of the experts should be considered through the lens of the medical data as a whole, and not simply thrown out because of the form of the medical data they consider was not the same as the form considered by other doctors.

**4.    The ALJ erred by not apportioning weight to the autopsy evidence, which is the "Gold Standard" for determining the extent of lung disease and which revealed a minimal level of coal mine dust exposure.**

Even if the ALJ correctly determined that the claimant was totally disabled, and is therefore entitled to the PPACA presumption, substantial evidence does not support the ALJ's decision with respect to causation in this case.

Mr. Fitzwater died from complications caused by a congenital abnormality of his aortic valve, also by his end stage congestive heart failure, end stage renal failure, and other serious medical conditions. None of these conditions

21

was caused, substantially contributed to, or aggravated by, his coal mine dust exposure.

Mr. Fitwater's death certificate—signed by Dr. Molly McShane of Charlottesville, Virginia[3]—shows his causes of death to be renal failure, congestive heart failure, and infective endocarditis. App. 1606. Pneumoconiosis was not listed as a cause or contributing factor to the death by the doctors present when Mr. Fitzwater passed away.

The pathology evidence in this case demonstrates, perhaps, why pneumoconiosis was not listed on the death certificate and also shows that Mr. Fitzwater's doctors, Dr. Smith and Dr. Houser, who insisted that pneumoconiosis played a significant role in the health problems and death of Mr. Fitzwater, were misinformed or had assumed incorrectly that Mr. Fitzwater had significant or serious lung disease from coal mine dust exposure.[4]

---

[3] The treating physician, Dr. Lynn Smith, was not treating Mr. Fitzwater for his terminal hospitalization because he had been transferred to the University of Virginia. The Death Certificate was signed by the physician who tested and treated and cared for Mr. Fitzwater at the end of his life.

[4] Dr. Smith, who throughout her deposition seemed to insist that Mr. Fitzwater had two lung diseases (pneumoconiosis from coal dust exposure and emphysema from smoking), admitted that she had ***never independently diagnosed Mr. Fitzwater with pneumoconiosis but had carried the diagnosis forward from the history given to her by the miner***. App. 1353-1354. Such an assumption was wrong, given the pathology evidence. This misassumption tainted all of Dr. Smith's pronouncements about the cause of the underlying lung disease and the etiological impact on other conditions.

The autopsy was performed on the chest only, even though one of the major problems of Mr. Fitzwater had was his intestinal bleeding and renal failure. The autopsy was limited by the request of the family. Therefore, this Court should note that the description of the weeks leading up to the death of the miner showed multiple blood transfusions, dialysis, renal failure, bleeding in the intestines. The autopsy prosector was not permitted to analyze these other organs in order to provide a complete assessment of Mr. Fitzwater's terminal health problems. App. 215-220. In the Final Pathologic Diagnosis, pneumoconiosis is listed, but is specifically noted as simple, not complicated pneumoconiosis, with only "mild pulmonary hypertensive changes." App. 219. There was no significant fluid noted in the lungs, and three other serious diagnoses were included, each with further explanation and subparts: status post aortic valve replacement and pacer placement, atherosclerosis, and cardiomegaly with ischemic cardiomyopathy. App. 217-218.

Dr. Lopes diagnosed pneumoconiosis pathologically but did not quantify the pneumoconiosis, nor the focal emphysema seen. As will be shown below, the other pathologists who reviewed the autopsy pathology samples did do this. Perhaps the most telling information from Dr. Lopes is the information she provided which suggests *that the other problems of Mr. Fitzwater* were what led to his death:

> The decedent is a 72 year old male with a past medical history of aortic stenosis secondary to a bicuspid aortic valve s/p aortic valve replacement, sleep apnea, type II diabetes, hypertension, chronic atrial fibrillation (s/p pacer for tachy-brady syndrome), chronic renal failure, coal miner's pneumoconiosis [sic] who presented to UVA on 8/2 for recurrent GI bleed secondary to multiple AVMs. The decedent stated that he has had approximately 96 transfusions in the last two years secondary to GI bleeding. The decedent was transfused and was doing well until the 9th of August, when he became dysarthric and had right sided weakness and was found to have a left thalamic stroke. On the 11th, he became febrile, with blood cultures growing out coag negative staph. On August 14th, he was found to have a thrombus in his left atrial appendage as well as a mass consistent with vegetation on his prosthetic aortic valve. Over the next several weeks, the decedent developed spontaneous bacterial peritonitis and worsening renal failure that required dialysis. On the 20th of September, his family made him comfort care and he passed away on the 24th of September.

App. 217. This description of the problems and conditions leading to the death of Mr. Fitzwater does not even suggest that lung disease played any role in his demise. Yet, the ALJ here found that it did.

Other pathologists provided much more detailed analyses of the lung tissue with respect to the impact of coal mine dust exposure on the lungs of Mr. Fitzwater. Dr. Everett F. Oesterling reviewed the lung tissue and rendered a report on dated July 28, 2009. App. 220. Dr. Oesterling noted that the Mr. Fitzwater's lungs showed no gross evidence of black pigment that would indicate significant coal dust deposition and resulting black lung. App. 221. He further noted that

24

the relatively modest quantities of dust seen "suggest a very low level of dust inhalation." App. 222. Also present on the slides were multiple cells with a finely stippled cytoplasm, which Dr. Oesterling said was from with the inhalation of tobacco smoke and indicated damage from smoking. App. 221. His review did not find any nodules of coal workers' pneumoconiosis in any of Mr. Fitzwater's lung sections. Further, the inflammatory cells in the lung tissue were not related to coal dust. App. 224. Therefore, Dr. Oesterling stated to a reasonable degree of medical certainty that "coal dust was in no way a factor in this gentleman's demise, his lung disease was primarily related to his cardiac disease which is unrelated to his coal dust exposure." App. 225. His opinion in that regard is not based on speculation, but on direct assessment of the lung tissue from the autopsy.

Dr. Stephen T. Bush, Board Certified in Pathology, reviewed Mr. Fitwater's autopsy report prepared in 2008, and also analyzed the tissue slides prepared at the University of Virginia Health Systems ("UVA Hospital"). He rendered a report dated August 27, 2009. App. 1611. Dr. Bush noted Mr. Fitzwater's relevant medical history of hypertension, diabetes, and a congenital abnormality of his aortic valve. He analyzed the lung tissue from the autopsy and reported that the generalized pulmonary emphysema present as evidenced by enlarged air spaces, was separate from and "has no relationship to the limited dust pigment". App. 1612. Dr. Bush opined that Mr. Fitzwater was totally disabled

25

prior to his death, noting evidence of a series of heart problems, including a prior myocardial infarction months or years before he died, as well as evidence of another myocardial infarction some weeks before death. He also stated that renal failure and the prosthesis which had been inserted to replace Mr. Fitzwater's aortic valve as a result of his congenital abnormality had become infected. Dr. Bush reported as well a fibrosis measuring .5 cm which was clearly the result of a lung injury and "without relation to coal dust pigment." App. 1612. Dr. Bush also reported that Mr. Fitzwater's slides showed only a minimal degree of simple pneumoconiosis with a limited amount of mineral particles in the claimant's lungs. He added that "the coal dust disease was too limited in degree and extent to have made any contribution to impairment or disability." App. 1612.

Thus, the autopsy reported only that Mr. Fitzwater had simple pneumoconiosis. The pathologists that specifically assessed the extent and damage to Mr. Fitzwater's lungs from coal mine dust exposure observed that the pneumoconiosis was minimal and that his generalized emphysema present was not associated with the anthracotic pigment or pneumoconiosis.

These assessments provide this Court with "gold standard" knowledge about the extent of coal mine dust induced lung disease in Mr. Fitzwater. The opinions about whether coal mine dust induced lung disease caused or contributed to the impairment and death of Mr. Fitzwater must be weighed against what this

Court knows to be the extent of disease as seen on actual lung tissue analysis. Physicians can provide their best assessment of diseases present and the causes of a patient's health conditions, but pathology evidence shows whether they were right or wrong.

The ALJ's weighing of the pathology evidence was in total error. First, she erred by discrediting Drs. Oesterling and Bush because they "did not have the benefit of considering a complete picture of the Miner's hospital course…" App. 165. This is an error, because as pathologists, Drs. Bush and Oesterling are not permitted to review anything but the pathology slides.

In *Tapley v. Bethenergy Mines, Inc*., BRB No. 04-0790 BLA (May 26, 2005) (unpub.), where Employer offered the opinion of Dr. Bush under 20 C.F.R. § 725.414(a)(3)(i) as a "biopsy" report, the Administrative Law Judge properly admitted the report only to the extent that Dr. Bush did not refer to inadmissible evidence, and the report was considered only to the extent it offered "an assessment of claimant's biopsy tissue for the existence of pneumoconiosis." The report could not be considered a "medical report" under 20 C.F.R § 725.414(a)(1) because Employer designated the reports of two other physicians under this category. As a result, Dr. Bush's opinion on disability causation was inadmissible. This Court should overturn the ALJ's finding in that regard and instruct the ALJ to consider all of the medical evidence.

27

Similarly here, the ALJ has essentially discredited Dr. Bush and Dr. Oesterling because Westmoreland followed the evidentiary limitations and only provided Dr. Bush and Dr. Oesterling the materials they are permitted to review, and not additional materials (like treatment records) that would have resulted in a violation of the evidentiary limitations.

The physicians who asserted that coal mine dust exposure played a significant role in impairment and death simply are not supported by the weight of the pathology evidence. The weight of the pathology evidence demonstrates that Mr. Fitzwater, in reality, had very little lung disease from coal mine dust exposure.

### 5. The ALJ erred by not apportioning weight to radiographic evidence that supported a finding of minimal coal mine dust exposure.

As noted earlier, Dr. Smith, the treating physician, never independently diagnosed or tested Mr. Fitzwater for black lung disease but simply carried forward a diagnosis given to her in history by Mr. Fitzwater, and this despite decades of treating him. App. 1353-1354. The weight of the pathology evidence shows her to be wrong in her assumptions. And, in fact, chest x-ray readings similarly support the finding, as confirmed by pathology, that Mr. Fitzwater had no or very little damage in his lungs from coal mine dust exposure. App. 1618.

In fact, of the over-thirty x-ray reports which appear in approximately the first 400 pages of Claimant's exhibit 1 (App. pp. 263-663), **none** diagnoses pneumoconiosis nor refers to pneumoconiosis. Those x-ray reports do, however, identify other significant health issues which would have impacted the claimant's health, including an enlarged heart, congestive heart failure, cardiomegaly, and pleural thickening, as examples of a long list of significant health problems from which the claimant was suffering. While the treatment x-ray readings obviously are not as relevant to the question of whether pneumoconiosis exists when there is pathology evidence, they do further support the conclusion that whatever coal mine dust induced lung disease was present, it was minimal and only seen upon closer pathological analysis of the lungs. The ALJ here never considered whether the treatment x-rays supported the opinions of the physicians in question.

**6.    The ALJ erred by not apportioning weight to the medical opinions which were best supported by the pathology and x-ray evidence, and which indicated that Mr. Fitzwater's death was due to a stroke, infected heart valve, and kidney failure.**

In this case, if the PPACA presumption of death due to pneumoconiosis is invoked, the presumption is rebutted because the best evidence, the evidence supported by the weight of the pathology evidence, demonstrates that the conditions causing the death of Mr. Fitzwater was not caused by coal mine dust induced lung disease.

29

Evidence relevant to establishing that death was due to pneumoconiosis within the meaning of the Act must be weighed together. Medical opinions cannot be assessed independent of the pathology evidence or the x-ray evidence. In *Island Creek Coal Co. v. Compton*, 211 F.3d 203 (4th Cir. 2000), the ALJ concluded that the miner did not establish pneumoconiosis through chest x-ray evidence under § 718.202(a)(1), but did find pneumoconiosis established via medical opinion evidence pursuant to § 718.202(a)(4). This Court rejected that approach. Citing to the Third Circuit's decision in *Penn Allegheny Coal Co. v. Williams*, 114 F.3d 22, 24-25 (3d Cir. 1997), which required the same analysis, this Court ruled as follows: "[W]eighing all of the relevant evidence together makes common sense. Otherwise, the existence of pneumoconiosis could be found even though the evidence as a whole clearly weighed against such a finding."

In this case, when all of the evidence is reviewed together, the small amount of coal mine dust induced lung disease Mr. Fitzwater had did not cause, substantially contribute to, or hasten his death from stroke, infected heart and renal (kidney) failure.

With respect to causation, the ALJ should not have credited Dr. Smith at all. First, Dr. Smith's testimony revealed that she based her opinion of causation of impairment and contribution to death on her belief that Mr. Fitzwater had two serious lung diseases present: pneumoconiosis from coal dust exposure and

emphysema from smoking.[5]    App. 1338.  But Dr. Smith admitted that she had never independently diagnosed pneumoconiosis but carried the diagnosis forward from a history given to her by the miner.  App. 1353-1354.  She also admitted that Mr. Fitzwater had a smoking history as high as 80 pack years.  App. 1328.

Second, Dr. Smith's statements are sometimes at odds with each other.  For example, at one point she states that Mr. Fitwater's supposed *cor pulmonale* was caused by pneumoconiosis.  App. 1333.  However, Dr. Smith later stated that the *cor pulmonale* was due to pneumoconiosis, sleep apnea and the valvular heart disease.  App. 1364.  .  Further, Dr. Smith often said Mr. Fitzwater had COPD.  *See*, *e.g.*, App. 1321.  But Dr. Smith also noted that the one pulmonary function test she relied upon in that conclusion did not show any obstruction by FEV1, FVC, or FEV1/FVC ratio—the usual values relied upon and the values used by the DOL regulations.  App. 1354-1355.  However, the test did show a reduced FEV25/75, but Dr. Smith then (1) admitted that she does not usually use the FEV25/75 to assess impairment, and (2) recognized that it made sense that the American Thoracic Society does not recommend using that value.  App. 1356.

Third, Dr. Smith ignores the terminal events which led to the death of Mr. Fitzwater.  She concentrates on the intestinal bleeding, which she attributes to

---

[5] Dr. Smith later said that some of the emphysema could be due to coal dust exposure, but agreed she would defer to the pathologist.  App. 1365.

the supposed *cor pulmonale*, but fails to see what Dr. Lopes at the University of Virginia said:  that Mr. Fitzwater had a stroke, was found to have a mass of infection around his heart valve, that he went into renal failure, and that, therefore, he died.

Fourth, Dr. Smith's assessment of *cor pulmonale*, to which she ascribes the intestinal bleeding, was based on a belief that it was caused by smoking induced lung disease, pneumoconiosis, sleep apnea and valvular heart disease.  In that context, it is difficult to credit Dr. Smith's opinion that pneumoconiosis played a substantial role in leading to *cor pulmonale*, which then led to intestinal bleeding, which then contributed to Mr. Fitzwater's death.  That analysis is too attenuated.  Moreover, as noted earlier, her notion that pneumoconiosis contributed to *cor pulmonale* is tainted by her belief that the pneumoconiosis was significant when the weight of the pathology evidence shows that it was not extensive enough to contribute to any impairment.  In fact, Dr. Smith even admitted that Mr. Fitzwater had pericarditis and that it, too, can cause *cor pulmonale*.  App. 1358.

Fifth, Dr. Smith blamed the intestinal bleeding on the venous pressures Mr. Fitzwater was experiencing because of his *cor pulmonale*.  However, Mr. Fitzwater was on anti-coagulation therapy for over a decade because of his congenital heart valve failure and replacement.  In other words, Mr. Fitzwater had

to have his heart valve replaced and was thereafter on anti-coagulation therapy, which causes someone to bleed easily. App. 1335. In fact, the family stopped his anti-coagulation treatment, which also carries with it a risk of stroke, and Mr. Fitzwater died shortly after having a stroke and thrombus. App. 1337.

Likewise, the opinions of Dr. William C. Houser on behalf of the Mr. Fitzwater should be given less weight. App. 1374. In his report dated February 15, 2012, he noted the inconsistency in the Mr. Fitzwater's smoking history, stating that [t]here are various smoking histories in the file ranging from 30 pack-years to 80 pack-years," yet still designated smoking as only a "contributing factor" rather than a cause of death.[6] In his deposition taken on March 22, 2012, although Dr. Houser opined that Mr. Fitzwater was totally disabled, his sole basis was that Mr. Fitzwater had been on oxygen since approximately 2002, which he attributed entirely to his coal mining experience that ended in 1986. App. 1414. However, the claimant's medical history suggests other more likely causes for his taking oxygen, including one or a combination of the conditions provided by the doctor in his report: atrial fibrillation, peptic ulcer disease, hypothyroid, cellulitis of the right lower extremity resulting in toxic shock syndrome, diabetes mellitus type 2, obstructive sleep apnea, right pleural effusion, and prior surgeries which included gallbladder and multiple heart surgeries. CX 5, pp. 9-10.

---

[6] The treating physician, Dr. Smith, confirmed it was 70 to 80 pack years. That is the equivalent of smoking 2 packs of cigarettes per day for 40 years. An intense smoking history.

33

With regard to the intestinal bleeding, Dr. Houser never comes right out and attributes the bleeding to coal mine dust induced lung disease. On cross examination, Dr. Houser admitted that Mr. Fitzwater had peptic ulcer disease and that peptic ulcer disease causes intestinal bleeding, which is a condition that has never been associated with coal mine dust exposure. App. 1458. Plus, as with Dr. Smith, Dr. Houser had to admit that taking anti-coagulants causes or contributes to intestinal bleeding.

Dr. Houser also admitted that none of the objective tests in this case which he relied upon met the DOL standards for disability. As with the opinion of Dr. Smith, Dr. Houser chooses to emphasize certain aspects of the medical data to support the claim of Mrs. Fitzwater, but inappropriately ignores crucial data about the end of life conditions of Mr. Fitzwater including the mass infection in the heart, the stroke, the renal failure, the peptic ulcer disease, the anti-coagulant therapy which increases bleeding, and the removal of dialysis in a patient suffering renal failure. He never explains how those conditions, all of which were clearly life threatening and life ending, would have not ended Mr. Fitzwater's life as and when it happened regardless of the small amount of pneumoconiosis and emphysema associated with coal dust exposure on autopsy. In the context of the medical data on Mr. Fitzwater, the causation and contribution opinion of Dr. Houser is not credible.

Noted above, Dr. Everett F. Oesterling rendered a report on behalf of Westmoreland dated July 28, 2009.  App. 220.    Again, Dr. Oesterling noted that Mr. Fitzwater's lungs showed no gross evidence of black pigment that would indicate coal dust or black lung, particularly relevant in that the claimant's upper lobes would be the area in which there would be significant amounts of coal dust visible on pathology slides if the claimant had pneumoconiosis.  App. 221.  He further noted that the relatively modest quantities of dust which has been inhaled and that are being removed through the "lymphatic fluids "suggest a very low level of dust inhalation."  App. 222.  Also present on the slides were multiple cells with a finely stippled cytoplasm, which Dr. Oesterling associated with the inhalation of tobacco smoke.  App. 221.    His review did not find any nodules of coalworkers' pneumoconiosis in any of the claimant's lung sections.  Inflammatory cells in the lung tissue were not related to coal dust.    App. 224.  Therefore, Dr. Oesterling stated to a reasonable degree of medical certainty that:  "coal dust was in no way a factor in this gentleman's demise, his lung disease was primarily related to his cardiac disease which is unrelated to his coal dust exposure."  App. 225.

Also noted above, Dr. Stephen T. Bush, Board Certified in Pathology, reviewed the claimant's autopsy report prepared in 2008, and the eight pathology slides prepared at the University of Virginia Health Systems.   He rendered a report dated August 27, 2009.    App. 1610.  With respect to Mr. Fitzwater's cause of

death, Dr. Bush's review of the claimant's histologic slides showed only a minimal degree of simple pneumoconiosis with a limited amount of mineral particles in the claimant's lungs.  Dr. Bush opined:

> The minimal degree of simple coal worker's pneumoconiosis did not contribute to the death of Mr. Fitzwater.  ...
>
> Coal worker's pneumoconiosis or occupational exposure to coal dust did not contribute to respiratory impairment or disability in Mr. Fitzwater. The coal dust disease was too limited in degree and extent to have made any contribution to impairment or disability.
>
> ***Coal worker's pneumoconiosis or coal dust exposure played no role in nor hastened the death of Mr. Fitzwater.***

App. 1613.  (emphasis added).  Therefore, Dr. Bush found the claimant's death was unrelated to any respiratory condition.

Westmoreland also introduced the report dated April 14, 2010, of Dr. David M. Rosenberg, Medical Director at the University Hospitals Health System of Cleveland, who holds three board certifications in internal medicine, pulmonary diseases, and occupational medicine.  App. 1649.  Dr. Rosenberg reviewed extensive medical information related to the claimant, including his autopsy report and information confirming the claimant's death at age 72.  He opined that death was related to renal failure which was consequent to congestive heart failure, and he also linked the required valve replacement necessary because of the claimant's congenital malformation that was complicated by pericarditis.  Significantly, Dr.

36

Rosenberg's noted that "[o]ver a several year period of time he required 100 transfusions to maintain his blood level."  App. 1649.  Dr. Rosenberg opined:

> From a radiological perspective, his B readings were … negative for the presence of micronodularity. Also, treatment records did not document the presence of this type of abnormality. Furthermore, his spirometry revealed no evidence of restriction, with his FVC being normal. Also, it should be appreciated that he had normal gas exchange in association with exercise, confirming the fact that he did not have chronic interstitial scarring. It should be noted that the latter assessment of measuring arterial blood gas with exercise is one of the best ways to determine whether or not the interstitium of the lung is intact. In the presence of an intact interstitium, gas exchange is normal. As applicable to Mr. Fitzwater his gas exchange was normal. When all the above information is looked at in total, without pathologic confirmation, Mr. Fitzwater was not diagnosable as having clinical CWP. With respect to pathologic findings, Mr. Fitzwater at worst he had a most minimal degree of clinical CWP.

App. 1658.  With respect to the Mr. Fitzwater's other conditions relevant to his cause of death, Dr. Rosenberg confirmed that the pulmonary function tests revealed no obstruction or restriction and, therefore, no disability.  App. 1659.  Likewise, he noted that the Mr. Fitzwater's sleep apnea was inadequately treated, so was placing strain on the right side of his heart, contributing to his pulmonary hypertension.  App. 1659.  Dr. Rosenberg also opined that although both coal dust and cigarette smoking can cause emphysema, this claim does not support a diagnosis of legal pneumoconiosis:

37

> [W]ith coal dust exposure, the inflammatory response associated with the dust deposited in the lungs causes a disruption of the normal alveolar structures. As such, pathologically, coal dust deposition would be found in close proximity to the emphysema developing in relationship to past coal dust exposure. Specific to Mr. Fitzwater, his emphysema was unassociated with coal dust deposition, and thus, clearly was not caused by past coal dust exposure. His emphysema did not represent the presence of legal CWP. Rather, his emphysema related to his extensive smoking history.

App. 1660.  With respect to Mr. Fitzwater's death, Dr. Rosenberg stated that he died related to complications of his congestive heart failure, which could not be adequately treated due to his renal failure.  "This renal failure was not caused or contributed to in any fashion by past coal mine dust exposure."  App. 1660.  Nor were Mr. Fitzwater's heart failure or gastrointestinal bleeding related to arteriovenous malformations attributed to pneumoconiosis.  As noted above, the law requires an analysis of the evidence in total and Dr. Rosenberg underscored that burden:

> When all the above information is looked at in total, Mr. Fitzwater's death was not caused, hastened or accelerated by past coal mine dust exposure and the presence of CWP. He died primarily from his congestive heart failure and renal failure, both of which were unrelated to past coal mine dust exposure.

App. 1660.   Dr. Kirk E. Hippensteel reviewed the Mr. Fitzwater's medical evidence and rendered an opinion dated May 24, 2010.  App. 1670.  He stated that any historical diagnosis of pneumoconiosis in Mr. Fitzwater's medical records was

38

unsupported by the objective test results in the medical records.  App. 1680.    Dr.
Hippensteel noted that the autopsy "is the most sensitive and specific test for the
presence or absence of pneumoconiosis and trumps the lack of objective evidence
of such a disease in life."    App. 1681.    However, he found that simple
pneumoconiosis seen only at autopsy rarely causes any clinically significant lung
impairment or negative cardiac function:

> This man does not have objective findings to suggest that
> he had any effects from his minimal simple coal workers'
> pneumoconiosis that caused, hastened, or contributed to
> his death. ***In other words, it can be stated with a
> reasonable degree of medical certainty that this man
> would've died at the same time had he never contracted
> coal workers' pneumoconiosis from his coal mine dust
> exposure.***

App. 1681.  (emphasis added).

Dr. Hippensteel also testified in this case.  App. 1688.  .  The doctor
stated that he was board certified in internal medicine and pulmonary diseases, as
well as being a B-reader.  App. 1691.  With respect to his review of the pulmonary
function testing introduced by Mr. Fitzwater in 1991, Dr. Hippensteel found the
results to rule out pneumoconiosis.  He opined that: "not only is there no evidence
of restriction from interstitial fibrosis from his coal mine dust exposure, he has no
evidence of emphysema related to either medical or legal pneumoconiosis[.]"
App. 1708.

Medical opinions are at the core of any decision about the cause of a person's death, and the preponderance of medical opinions in this case do not establish that coal mine dust exposure caused to substantially contributed to the claimant's death. The best supported evidence in this case based on the real assessment of the extent of lung damage from coal mine dust exposure pathologically, confirms that the death of Mr. Fitzwater from a mass infection of his mechanical heart valve, stroke, blood clots, and kidney failure resulted in his death when he was taken off of dialysis and put in comfort care to pass away. The limited lung disease from coal mine dust exposure did not cause, contribute or hasten his death from these other life threatening and life ending conditions which were not in any way related to coal mine dust exposure.

The Judge's key error in assessing this evidence is that she failed to weigh all the of the evidence together with the pathology evidence, which clearly shows that any coal dust deposition in the lungs was minimal. The evidence relevant to establishing that death was due to pneumoconiosis within the meaning of the Act must be weighed together. Medical opinions cannot be assessed independent of the pathology evidence or the x-ray evidence. The Judge should not assess each physician's analysis in a vacuum, but must weight them together. In *Island Creek Coal Co. v. Compton*, 211 F.3d 203 (4th Cir. 2000), the Administrative Law Judge concluded that the miner did not establish

40

pneumoconiosis through chest x-ray evidence under § 718.202(a)(1), but did find

pneumoconiosis established via medical opinion evidence pursuant to §

718.202(a)(4). This approach was rejected by the Fourth Circuit in a decision

which held that an Administrative Law Judge must weigh all evidence together.

The Circuit Court cited to the Third Circuit's decision in *Penn Allegheny Coal Co.*

*v. Williams*, 114 F.3d 22, 24-25 (3d Cir. 1997) which required the same analysis:

> [W]eighing all of the relevant evidence together makes
> common sense. Otherwise, the existence of
> pneumoconiosis could be found even though the
> evidence as a whole clearly weighed against such a
> finding.

The Court also rejected the Director's position that the x-rays and medical opinions

should be viewed separately because they allegedly measure different types of

pneumoconiosis (medical versus legal). The Fourth Circuit found the Director's

approach was not a reasonable interpretation of either the Act or the regulations:

> [A]lthough we recognize that there is a meaningful
> distinction between evidence of medical pneumoconiosis
> and evidence of legal pneumoconiosis, it cannot be said
> that evidence showing that a miner does not have medical
> pneumoconiosis is irrelevant to the question of whether
> the miner has established pneumoconiosis for purposes of
> a black lung claim. Further, nothing in the text of the
> regulation supports his position.

Thus, x-rays alone or medical opinions alone, or individual element of a

physician's analysis alone, cannot be reviewed category by category to determine

whether the presumption is overcome or the preponderance of all of the evidence establishes the presence of a coal mine dust induced lung condition or impairment. In this case, when all of the evidence is reviewed together, it is clear that the small amount of coal mine dust induced lung disease Mr. Fitzwater had did not cause, substantially contributed to, or hasten his death from stroke, infected heart and renal (kidney) failure. Only by improperly discrediting certain physicians and feeling with the evidence together could be contrary conclusion be reached. Mr. Fitzwater died of a combination of heart and kidney conditions unrelated to coal mine dust exposure. The ALJ failed to weigh the physicians' opinions on these issues together, instead dismantling them piecemeal in favor of claimant.

## VI.  REQUEST FOR ORAL ARGUMENT

Employer/Appellant requests oral argument of this matter. The Court's decisional process will be significantly aided by oral argument, and the responsible operator issue is novel in that the DOL identified insurance and ignored the insurance.

## VII.  CONCLUSION

For the reasons set forth above, the decision and order of the Benefits Review Board affirming the decision and order of the administrative law judge granting benefits in this case should be reversed by this Court, and this matter should be remanded for further consideration.

Respectfully submitted,

/s/ Thomas M. Hancock
Paul E. Frampton
Thomas M. Hancock
BOWLES RICE LLP
600 Quarrier Street
Charleston, West Virginia  25301
(304) 347-1163

<u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Hancock, certify that on September 9, 2015, the foregoing document was served upon all parties or their counsel of record through the CM/ECF system.

<u>/s/ Thomas M. Hancock</u>
Paul E. Frampton, Esq.
Thomas M. Hancock, Esq.
Bowles Rice LLP
800 Quarrier Street
Charleston, West Virginia  25301
(304) 347-1163
Counsel for Westmoreland Coal Company

44

7316385.1

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 15-_____        **Caption:** Westmoreland Coal Co. v. DOWCP and Fitzwater

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✔] this brief contains _____10,448_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✔] this brief has been prepared in a proportionally spaced typeface using
   Word 2010_____ [*identify word processing program*] in
   14 - Times New Roman_____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Thomas M. Hancock_____

Attorney for Westmoreland Coal Company_____

Dated: 9/9/2015_____